Fred **WHITAKER** et al., Appellants,

v.

N. E. **FORMBY** et al., Appellees.

No. 8001.

Court of Civil Appeals of Texas, Texarkana.

May 25, 1971.

Rehearing Denied July 20, 1971.

Tom Roberts, Carthage, for appellants.

Robert G. Schleier, Bean, Ford, Schleier & Dickerson, Kilgore, for appellees.

DAVIS, Justice.

The Opinion handed down in this case on March 30, 1971, is withdrawn, and the following is substituted in lieu thereof.

The Appellees, N. E. Formby, H. E. Thornbrough, James A. Talley, A. L. Dawsey, Jr., W. E. Richey, Weldon D. Moore, John K. Cain, Lee Ray, Taylor Jobe, H. L. Rogers, Jr., B. J. Woolley, Dr. Charles S. Bloom, Joe Collins, Gerald Hammer, Dr. W. C. Smith, Sidney Pinkston, Jr., L. W. Martin, Marion Dingler, Trustee, Southside State Bank, Tyler, Texas, First State Bank, Big Sandy, Texas, Vincent Richbourg, Howard W. Wilson, Murph Wilson, J. G. Roberts, A. W. Riter, Jr., Trustee, and Peoples National Bank of Tyler, Texas, have filed an outstanding and most excellent Motion for Rehearing. They have convinced this Court that our original Opinion is not in keeping with the laws of contracts and Rule 166–A, Texas Rules of Civil Procedure. We must affirm the Judgment of the Trial Court.

This law suit involves two Oil and Gas Leases, executed on February 18, 1961, by Rade Snelgrove, now deceased, and his wife, Coystal Snelgrove, and Ralph Snelgrove, Lessors, to John R. Yarbrough, Lessee, on 128 acres and 100 acres of land in the Henry Chapman Survey in Rusk County, Texas. These Leases were amended on March 6, 1961. Lessee signed the Leases and Lease Amendment. Only the original Lease to the 100-acre tract, and the Amendment thereto, is contained in the record. The 128-acre Lease is not in the record.

A survey of the land described in the Lease as containing 100 acres of land, shows that it contains 113.12 acres.

After the death of Rade Snelgrove, Peggy Leopard became an heir to his interest.

On April 8, 1966, Coystal Snelgrove, surviving wife of Rade Snelgrove, Peggy Leopard and husband, Horace Leopard, and Ralph Snelgrove, as Lessors, executed an Oil and Gas Lease to Fred Whitaker, as Lessee, which only conveyed a lease on 33 acres of land out of the 113.12 acres for a primary term of 1½ years.

The original Lease and the Amendment thereto were assigned to N. E. Formby, et al, under the terms of the Lease and the Amendment. Lessees commenced the drilling of an oil well on the 113.12-acre tract of land, and secured a producing oil well. The original Lease and the Amendment thereto contain a provision that if Lessee secured the production of an Oil Well and should fail to commence the drilling of another oil well within 12 months after the completion of such well " * * * all acreage covered by this Lease save and except 80 acres around the first well, * * shall terminate." The Lease Amendment provided that Lessee shall, *at his sole election,* select or designate the acreage that shall be earned or validated by the drilling of the first test well. The first test well

was completed as a commercial producer during the primary term of the original Lease. The application to drill the test well, as required by the Railroad Commission of Texas, Form 2—Well Record, and Form 3—Potential Test, were all filed within the 90-day primary term.

Division orders covering all of the productions from the well, dated January 22, 1961, were executed by all owners of interest in production, including royalty, over-riding royalty, and working interest of the owners.

After the death of Rade Snelgrove, leaving an interest to his daughter, Peggy Leopard, wife of Horace Leopard, who, with Coystal Snelgrove, a widow, Ralph Snelgrove, Peggy Leopard and husband, Horace Leopard, executed an Amended Division Order on February 6, 1964.

The Oil and Gas Lease executed to Fred Whitaker on April 8, 1966, covering the 100-acre tract, expressly excepted " * * * 80 acres of land subject to * * * the Oil, Gas, and Mineral Lease" of Appellees. Prior to delivery or payment for this Lease, the attorneys for the Snelgrove and Leopards advised Appellant Whitaker that the 80 acres owned by Appellees' Lease had not been set off, and required a letter-agreement, which reads as follows:

"Dear Mr. Whitaker:

"The undersigned are delivering to you a Lease dated April 8, 1966, covering 113 acres of the Henry Chapman Survey, save and except 80 acres held under an oil and gas lease executed by Rade Snelgrove, et al, Lessors, to John R. Yarborough, as Lessee, dated February 18, 1961, recorded in Volume 717, Page 571, of the Deed Records of Rusk County, Texas.

"It is agreed that by the acceptance of the lease dated April 8, 1966, you understand that the 80 acres held under such lease above referred to, has not been set out by field notes.

"In any event, any expenses which may be incurred in having the 80 acres held

under such lease set out and described, shall be *born* by you, including any expense of litigation, attorneys fees, court costs, or otherwise. That is, the Lessors in the lease dated April 8, 1966, shall not be out any expense in such matter; notwithstanding it may develop that it be necessary to name the Lessors of such lease of April 8, 1966, as parties to any suit.

"You may indicate your acceptance of the terms of this letter in connection with the delivery of the lease dated April 8, 1966, by signing at the place indicated."

Appellants Snelgroves and Leopards always admitted that the Lessees owned an 80-acre Lease out of the 113.12-acre tract of land, called 100 acres in some of the title papers. They actually included in the Lease to Appellant Whitaker the following language:

"SAVE AND EXCEPT, however, 80 acres of said lands subject to an oil, gas and mineral lease executed by Rade Snelgrove, et al, as Lessors, to John R. Yarborough, as Lessee, dated February 18, 1961, filed for record March 13, 1961, recorded in Vol. 717, Page 571 of the Deed Records of Rusk County, Texas."

According to the letter, Appellants Snelgroves and Leopards were not claiming any title to the lease on the 80 acres around the well, were not making any demand upon Lessees to declare which 80 acres they would take out of the 113.-12-acre tract, and they were all accepting the royalty payments as specified in the original lease and the amendment thereto.

Both Appellants and Appellees filed Motions for Summary Judgment. Judgment was entered in favor of the Appellees, holding that the Appellants take nothing. Appellants perfected their appeal and bring forward nine points of error.

Appellants had also sued Permian Corporation, the purchaser of the oil. A Motion was filed to sever the action

against Permian Corporation, pending a final Judgment in the case. The Motion was granted.

Appellants say that the trial court erred in granting the Judgment in favor of Appellees bcause there were material fact issues as a matter of law that have to be decided by the trial court, or a jury, that the Appellees had failed to select the 80-acre lease, Appellees' failure to designate the 80 acres created a material issue of fact, and because of the failure to partition the acreage, they were damaged in the amount of $60,000.00.

According to Appellant Whitaker's testimony, by deposition, from the date of the acquisition of his Lease, he claimed that he owned an undivided interest in the entire 113.12-acre tract (called 100 acres), and in Appellees' well and the production therefrom. He further testified that he would agree to a partition of the Lease provided he received the west 33-acre tract out of the 113.12 acres so he could drill a well out of the Northwest corner. Appellant Whitaker did not follow the instructions given him in the letter and file a partition suit; he only filed a suit for damages.

Appellant Formby testified, by deposition, that after he failed to drill the second well, he did not claim more than the 80 acres surrounding the well, and never refused to release all over 80 acres.

On October 9, 1967, one day after the expiration of the primary term of Appellant Whitaker's Lease, Appellees selected the North 80 acres and released the South 33.12 acres described in the Lease.

Much of the original Oil, Gas, and Mineral Lease of Appellees was copied in the original Opinion, in which we tried to show that it was necessary to drill a second test well, and that it created a material fact issue. We also held that the Lease and the Amendment thereto created some ambiguity. After a further study of the original lease, and the amendment thereo, this writer must confess that we were wrong. A careful study of the original lease and amendments "C" and "D" thereto read, in part, as follows:

(Original Lease):

"13. As a further consideration for the execution of this lease, Lessee, his heirs, successors or assigns, agrees to commence the drilling of a well on the above described tract of land within ninety (90) days from this day, and to prosecute the drilling of such well for oil or gas, or both, with reasonable diligence, and by the term 'commencement of such well' shall be satisfied when the actual making of the hole under power has been commenced, and the drilling of such well, as above stated, shall be prosecuted with reasonable diligence until same is completed as a producer of oil or gas, or abandoned as a dry hole, and if such well is not commenced within ninety (90) days from this date, then this lease shall terminate and be of no further force and effect.

"14. However, if said well is commenced, as above stated, within the ninety (90) day period, and same is completed as a producer of oil, and the potential thereof has been established by the Railroad Commission of Texas, and same is a commercial well, then from the date of the completion of such well as a commercial producer of oil, the Lessee, his heirs, successors or assigns, agrees to commence the drilling of another well within the period of twelve months from the completion of such well, but in no event shall the commencement of the second well be later than eighteen (18) months from the date of this lease, and the twelve months period shall be reduced, in the event that twelve months from the date when the first well is completed as a commercial oil well should extend beyond eighteen (18) months from the date of this lease, *and if such second well is commenced, such second well shall be drilled upon a drilling unit formed by taking the remainder of the 100 acres, after deducting 80 acres,* and taking

enough acreage out of a 128-acre tract covered by a lease bearing even date between the parties hereto, to make 80 acres in forming such drilling unit for such second well, *and if such second well is commenced,* same shall be prosecuted with reasonable diligence until completed, and same shall be tested and the potential thereof established by the Railroad Commission of Texas, and *if same is so completed and classified as a commercial oil well,* then and in that event, from the date of such completion of such well, as a commercial oil well, Lessee, his heirs, successors and assigns, *agrees to commence a third well* on the remainder of the 128 acres covered by a lease bearing even date herewith executed between the parties hereto all as provided in a lease covering the 128 acres.

"15. It being specifically understood and agreed between the parties hereto that the Lessors herein have executed this lease, as well as a lease covering a 128-acre tract, and the conditions and provisions for the drilling of the wells as herein set out *is* a part of the consideration for execution by the parties hereto as lessors for said leases, and it is specifically agreed that should the first well hereinabove provided to be drilled on the 100-acre tract covered by this lease should not be commenced and drilled to completion either as a producer of oil or gas, or as a gas well, within the time limit as hereinabove specified, then this lease, as well as the lease this day executed covering the 128-acre tract, shall terminate and both leases shall be of no further force or effect.

"16. It is further understood and agreed that *if the first well* herein contracted to be commenced and drilled, *should be drilled and completed,* as hereinabove specified, and completed *as an oil well,* and Lessee, his heirs, successors, or assigns, should fail or refuse to drill the second well, as hereinabove contracted and specified to be drilled, within the time limit as herein provided, *then and in that event, all of the acreage covered by this lease, save and except 80 acres around the first well,* and all of the 128 acres covered by the lease this day executed between the parties, *shall terminate,* and such lease or leases shall be of no further force and effect, and all of the right, title and interest created by this lease to such remaining acreage of the tract of land above described, *save and except the 80 acres out of the 100 acres* and all of the 128 acres covered by the lease this day executed covering the 128 acres *shall be forfeited,* and lessee, his heirs, successors or assigns, shall have no further right, title or interest therein.

"17. Further *if the second well* is drilled, as hereinabove provided and contracted for, within the time limit as specified, and same is completed as an oil well, as hereinabove set forth, and the lessee, his heirs, successors and assigns, shall fail or refuse to drill the third well hereinabove contracted for within the time specified, then and in that event, all of said acreage covered by this lease, and the lands covered by the lease covering the 128 acres described in a lease bearing even date herewith between the parties, shall terminate, except as to 160 acres around the two wells drilled and completed as oil wells, that is, the first two wells contracted to be drilled, as herein provided, shall each validate this lease as to 80 acres per well, and when said third well is drilled, as herein provided, then this lease as to the 100 acres, if all of the 100 acres covered by this lease is not used in a unit formed for the purpose of drilling the second well, and all of the remaining acres of the 128 acres covered by lease bearing even date herewith, shall be forfeited to lessors, and such lease as to the remaining acreage shall be of no further force and effect.

"18. However, it is specifically agreed that if the first well drilled is completed and same is a gas well capable of producing gas only, and is so classified as a gas well, then the completion of such well as a gas well shall validate this lease as to all of the acreage above described in this lease,

as well as the acreage described in the lease bearing even date herewith between these parties covering the 128 acres; provided that all of the acreage covered by said two leases is placed in a production unit, that is, all of the acreage covered by said two leases, shall be used in forming a gas well unit using the first well drilled as the well for such production unit; otherwise, such acreage as not placed in such unit shall be forfeited by lessee, his heirs, successors or assigns, and his title thereto shall revert to lessors." (Emphasis added.)

## AMENDMENTS "C" AND "D" READ AS FOLLOWS:

"C. The following provision will be added and considered a part of the 100-acre lease and the 128-acre lease:

" 'In the event any one or more of the test wells commenced upon the 100-acre, or the 128-acre tract, shall be abandoned prior to reaching a depth of 7,000 feet, or shall be abandoned as a dry hole; in that event Lessee has an additional 15-days upon which to commence an additional test well upon that portion of the leasehold estate, that the same was drilled and thereby prevent the forfeiture of that portion of the leasehold estate that would have been earned by the completion of a well capable of producing oil in commercial quantities.

" *'And further, in the event Lessee shall fail to commence any one of the three (3) test wells* and to prosecute the drilling thereof with reasonable diligence and in a workmanlike manner, the *only liability and obligation to be suffered by Lessee shall be the loss of that portion of the leasehold estate that would have been earned or validated by the drilling of said test well as above provided.'* "

"D. The 100-acre lease, and the 128-acre lease *is* hereby amended as follows:

"Lessee shall, at his sole election, select or designate the acreage that shall be earned or validated by the drilling of the first and second test wells; provided, however, *that the acreage validated by the first test well shall be taken entirely out of the 100-acre lease*, and that the balance of the 100-acre lease shall be taken in the acreage earned or validated by the second test well, either upon the 100-acre lease or the 128-acre lease, but within the time specified in said lease; provided further, that if it be upon a portion of the land covered by the 100-acre lease, it will validate a sufficient number of acres covered by the 128-acre lease to make a total of 80 acres validated by second well as provided for in said lease, and said 128-acre lease in such event as to the additional acres selected by lessee shall be perpetuated for as long thereafter as oil, gas, or other minerals are produced from said 80 acres so validated by the second test well without the cessation of production or drilling operations thereon for a period in excess of 60 days." (Emphasis added.)

■ A careful study of these quotations clearly shows that the two instruments are wholly unambiguous. A careful construction, as evidenced by Appellants Snelgroves' and Leopards' letter-agreement to Appellant Whitaker regarding the lease to him, expressly providing that same was subject to Appellees' 80 acre lease, Appellands Snelgroves and Leopards construed, ratified and revived all rights of the Appellees in the Lease and the Amendment thereto, including the right of selection of the 80-acre lease. Grissom v. Anderson (1935), 125 Tex. 26, 79 S.W.2d 619; Humble Oil and Refining Company v. Clark (1935), 126 Tex. 262, 87 S.W.2d 471; Loeffler v. King (1951), 149 Tex. 626, 236 S.W.2d 772; Copeland v. Stanolind Oil and Gas Co., Tex.Civ.App. (1955), 279 S.W.2d 893, n. r. e.

We are highly impressed with the opinion of the Texas Supreme Court in Southland Royalty Co., et al. v. Pan Amer.

Petroleum Corp., et al., Tex. (1964), 378 S.W.2d 50, and the outstanding concurring opinion by Chief Justice Calvert in the construction of an oil, gas and mineral lease.

We find in the case of Turner v. Hunt, Tex.Com.App. (1938), 131 Tex. 492, 116 S.W.2d 688, opinion adopted by the Supreme Court, where they had an unexplained delay of nearly 9½ years, the Court said:

"It is our opinion that Turner's delay * * *, though long and unexplained, cannot be held sufficient to defeat his right because the facts as to the effects of the delay have not been developed. Except in case of extreme delay * * * delay, which works no injury or no disadvantage to another, is not such laches as will bar a right."

■ Appellees' lease gave them the option to select the 80 acres. The 80 acres are clearly required to be around the producing oil well. There is nothing unique or ambiguous about the provision in the Oil, Gas and Mineral Lease and the amendment thereto. Francis v. Pritchett, Tex.Civ.App. (1955), 278 S.W.2d 288, writ ref'd; Hunter v. Booker, 158 La. 690, 104 So. 618; Baldwin v. Kubetz, (1957), 148 Cal.App.2d 937, 307 P.2d 1005.

■ Appellant Whitaker did not seek a partition of the lease according to the letter from Appellants Snelgroves and Leopards as stipulated in the letter from the attorneys and as provided in the lease to Whitaker. He claimed an undivided interest in the entire 113.12-acre tract of land and all of the production therefrom. This would be contrary to his agreement with his lessors. Appellant Whitaker did testify that he would agree to a partition if the Appellees would give him the west 33 acres so that he could drill a well out of the northwest corner of the Snelgrove tract. There is not one word of testimony in the record that either Appellants Snel-

groves or Leopards have heretofore requested the Appellees to exercise the right of selection of the 80-acre lease. There are no pleadings or evidence by Appellant Whitaker whereby he legally requested the Appellees to select or designate the 80-acre lease surrounding the oil well. If the Appellees should have been legally requested by all Appellants to select or designate the 80-acre lease around the oil well, and the Appellees should have failed and refused to do so, then Appellees would have, as a matter of law, recognized that Appellant Whitaker owned an undivided interest in Appellees' oil well. This, Appellee Formby testified, by deposition, that Appellees were not willing to do. Therefore, we cannot see where there was any issue of material fact created. Appellants seemed to have impaled themselves upon a dilemma of their own making. Instead of requesting the Appellees to exercise their right of selection, Appellants denied them this right by claiming an undivided interest in the whole lease. As a matter of law, the Texas Supreme Court has repeatedly held that repudiation of a legal right excuses the exercise thereof. Kinzbach Tool Co. v. Corbett-Wallace Corp., 1942, 138 Tex. 565, 160 S.W.2d 509; Archer County v. Webb (1960), 161 Tex. 210, 338 S.W.2d 435; Amerada Petroleum Corp v. Doering, (5 Cir. 1937) 93 F.2d 540.

The above-mentioned letter and the provision contained in Appellant Whitaker's lease, the Texas Supreme Court has repeatedly held that such an instrument which refers to an earlier one as being valid and subsisting will ratify or revive such earlier instrument which may have been defective or have lapsed. Grissom v. Anderson, supra; Humble Oil & Refining Co. v. Clark supra; Loeffler v. King, supra; Copeland v. Stanolind Oil & Gas Co., supra.

Speaking of contracts, the Court said in Menard v. Snydor, 29 Tex. 257, and restated in Southland Royalty Co. v. Pan

**248**

Amer. Petroleum Corp., Tex.Civ.App. (1962), 354 S.W.2d 184, as follows: "As men bind themselves, so must they stand bound," reversed on other grounds, 378 S.W.2d 50.

Abraham Lincoln said in his first inaugural address on March 4, 1861, "One party to a contract may violate it—break it so to speak; but does it not require all to rescind it?"

Appellants did not allege any ambiguity, any fraud in the preparation of the writings, accident or mutual mistake in the preparation thereof, nor have they raised these matters as a point of error. We submit that this matter is not before the Court on this appeal. Oliver v. Landry Estate (Tex.Civ.App.1959), 326 S.W.2d 923, n. w. h.; Gardner v. Martin (Tex. Civ.App.1960), 336 S.W.2d 263, reversed on other grounds, 162 Tex. 156, 345 S.W.2d 274.

Appellant Whitaker's Oil, Gas and Mineral Lease expired under its primary term on October 8, 1967.

There is no pleading or proof in the record that Appellant Whitaker ever tried to drill a well on the 113.12-acre tract of land that is involved in this law suit, nor that he ever attempted to secure a partition of the same. Therefore, when we study the original lease, and the amendment thereto, and the lease to Appellant Whitaker which says that 80 acres of said land are subject to an oil, gas and mineral lease, and the letter addressed to and signed by Appellant Whitaker, there is no showing of any material fact issue, as a matter of law, that must be decided by the trial court. The summary judgment is correct, Rule 166–A, T.R.C.P.

The points of error are overruled.

The Judgment of the Trial Court is affirmed.